## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NIKYAHETTA NELSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-218-SPB |
| | ) | |
| COUNTY OF ERIE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION

**Susan Paradise Baxter, United States District Judge**

In this civil action, Plaintiff Nikyahetta Nelson ("Plaintiff") asserts claims under 42 U.S.C. §1983, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e-2, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. §§951-963, for racial discrimination that allegedly occurred in connection with the termination of her employment. Named as Defendants are Major Gary Seymour, Deputy Warden of Security at the Erie County Prison ("Seymour") as well as Stairways Behavioral Health ("Stairways") and the County of Erie ("Erie County" or the "County"), both of whom Plaintiff identifies as her joint employers. Currently pending before the Court is a motion for summary judgment filed on behalf of the County and Seymour (collectively, the "County Defendants"). *See* ECF No. [72]. Also pending is a motion for summary judgment filed by Stairways. *See* ECF No. [76]. For the reasons that follow, the Defendants' motions will be granted, and judgment will be entered in their favor pursuant to Rule 56.

1

I.      **FACTUAL BACKGROUND** [1]

Defendant Stairways is a non-profit organization providing therapeutic and rehabilitation services, including addiction services, to individuals in the Erie community with mental health needs.  ECF No. 79, ¶1; ECF No. 89, ¶1.  Pursuant to a contract with Erie County, Stairways offers its addiction services to individuals incarcerated in the Erie County Prison (at times hereafter, "ECP" or the "Prison").  ECF No. 79, ¶2; ECF No. 89, ¶2.

Plaintiff is an African American female who was hired by Stairways in November 2016 to work as a forensic case manager in Stairways' blended case management program.  ECF No. 74, ¶¶1-2; ECF No. 88, ¶¶1-2; ECF No. 93, ¶1.  In that role, Plaintiff assisted formerly incarcerated individuals with aspects of daily living such as acquiring housing, food, utilities, education, therapy, and transportation.  ECF No. 79, ¶8; ECF No. 89, ¶8.

In or around November 2017, Plaintiff elected to transfer out of the blended case management program to a position in Stairways' drug and alcohol program which involved counseling inmates at ECP.  ECF No. 74, ¶¶7-8, ECF No. 88, ¶¶7-8; ECF No. 79, ¶10; ECF No. 89, ¶10.  At the time, Erin Mrenak ("Mrenak") served as the Director of Addiction Treatment Services for Stairways and oversaw the drug and alcohol program.  ECF No. 74, ¶¶10-11; ECF

---

[1]  The following facts are derived from: (1) the County Defendants' Concise Statement of Material Facts in Support of their Motion for Summary Judgment, Plaintiff's responses thereto, and the County Defendants' reply, ECF Nos. 74, 88, and 96; (2) Stairways' Concise Statement of Material Facts, Plaintiff's responses thereto, and Stairways' reply, ECF Nos. 79, 89, 101; and (3) Plaintiff's Statement of Material Fact, together with the Defendants' responses thereto, ECF Nos. 93, 97, and 100.  Where relevant, the Court also cites portions of the evidentiary record.  To the extent any party's statement, acceptance, or denial of a material fact does not comply with the directives of LCvR 56(B)(1) and 56(C)(1)(b), requiring citations to specific evidence in the record, it has been disregarded.

Unless otherwise noted, the following facts are not genuinely disputed.  For purposes of this Memorandum Opinion, any genuinely disputed facts are construed in the light most favorable to Plaintiff.

No. 88, ¶¶10-11.  After applying for the position as a drug and alcohol therapist at ECP, Plaintiff was interviewed by Mrenak and two other drug and alcohol counselors who were already treating inmates at the Prison -- Kimberlea Casey ("Casey") and Michelle Witsch ("Witsch").  ECF No. 74, ¶¶9, 13-14; ECF No. 88, ¶¶9, 13-14.

Plaintiff was subsequently accepted into Stairways' drug and alcohol counseling program and received orientation training at the Prison on November 20, 2017.  ECF No. 74, ¶15; ECF No. 88, ¶15; ECF No. 79, ¶12; ECF No. 89, ¶12; ECF No. 93, ¶3; ECF No. 97, ¶3; ECF No. 88, ¶16.  Among the policies the County claims to have specifically reviewed with Plaintiff are Erie County Department of Corrections Policies 620.03 (pertaining to "Uniformed Staff Dress and Equipment") and 620.05 (pertaining to "Professional Attire Standards for Non-Uniformed Staff").  See ECF Nos. 72-21 and 72-22; see also ECF No. 74, ¶19.  Pursuant to the latter policy, "Inappropriate Attire" included (among other things) "Attire that conveys inappropriate or offensive messages," "Spandex sportswear," "Sweat/warm-up suits," and "Revealing, low-cut (in front/back), transparent, provocative, or tight (form fitting) clothing[.]"  ECF No. 72-21 at 1.  Policy 620.03 contains a specific subsection addressing the dress standards for "Contracted Staff" and specifies that "Mental Health" workers will wear a "[d]ark blue polo shirt with county logo."  ECF No. 72-22 at 4.  According to the County, drug and alcohol counselors were deemed to fall under the "mental health" category of contracted staff.  ECF No. 74, ¶22.

When testifying at her deposition, Plaintiff could not recall whether she ever received copies of the Prison's policies, but she acknowledged having been tested on her understanding of many different prison policies, including certain matters pertaining to safety and security as well as acceptable attire.  See ECF No. 72-2, Pl.'s Depo. at 38-39, 41, 43, 73.  She specifically recalled being instructed during her orientation that she could not wear "shorts or skirts or tank

tops or swimsuits or spandex or flipflops or open toe shoes." *Id.* at 73.  Plaintiff also recalled

Mrenak advising her during the interview process that she would be receiving a blue polo shirt

and a blue zip-up jacket, both of which were eventually issued to her a couple months after she

began working at ECP.  *Id.* at 71-75, 79.  According to Plaintiff, Mrenak had informed her that

drug and alcohol therapists could wear khaki pants with the blue polo shirt or, alternatively,

khaki pants and the zip-up jacket "with any shirt underneath as long as it didn't have profanity,

nudity, or anything unprofessional on it."  *Id.* at 74.  Plaintiff also understood that she was not

permitted to wear inappropriate messages or logos or anything revealing, low cut, tight or form

fitting under the zip-up jacket.  *Id.* at 78.  Defendants agree that Stairways employees were

permitted to wear the zip-up jackets bearing the County logo, even though that attire is not

specifically addressed in the County Department of Corrections policies.  ECF No. 93, ¶3; ECF

No. 97, ¶3; ECF No. 100, ¶3.

At all times relevant to this litigation, ECP's warden was Kevin Sutter.  ECF No. 72-4,

Sutter Depo. at 4-5.  The prison also had three deputy wardens, including Defendant Seymour,

who served as Deputy Warden of Safety and Security.  *Id.* at 6; *see also* ECF No. 79, ¶3; ECF

No. 89, ¶3.  In that capacity, Seymour was responsible for, among other things, maintaining the

security and safety of the jail, monitoring video surveillance, and conducting investigations.

ECF No. 79, ¶4; ECF No. 89, ¶4.

During her tenure as a drug and alcohol therapist, Plaintiff's direct clinical supervisor was

Wayne Sharrow.  ECF No. 74, ¶¶12, 27; ECF No. 88, ¶¶12, 27.  Sharrow, in turn, reported to

Mrenak.  ECF No. 79, ¶16; ECF No. 89, ¶16.  Neither Sharrow nor Mrenak worked within the

Prison, ECF No. 79, ¶17; ECF No. 89, ¶17, and the only other Stairways employees who were

assigned to the drug and alcohol program at ECP were Casey and Witsch.  ECF No. 74, ¶26;

4

ECF No. 88, ¶26; ECF No. 79, ¶¶13, 19; ECF No. 89, ¶¶13, 19.  Stairways did have other staff members at the prison, however, including Stacy Petruso, a supervisor in Stairways' mental health program at ECP.  ECF No. 79, ¶¶19-20; ECF No. 89, ¶¶19-20.  Although Petruso had no supervisory authority over Plaintiff or the other drug and alcohol therapists, she was the only Stairways supervisor in the facility and served as a point of contact for prison personnel with respect to issues concerning other Stairways' employees.  *See* ECF No. 72-7, Petruso Depo. at 23-25, 50-51; ECF No. 72-8, Petruso Depo. at 10; ECF No. 72-5, Carroll Depo. at 37; ECF No. 72-10, Witsch Depo. at 46-47.

While employed in the drug and alcohol program at ECP, Plaintiff shared office space with Witsch and Casey.  ECF No. 72-9, Casey Depo. at 53-54.  Plaintiff claims that, during this time, Witsch commented on Plaintiff's hair and her lips and made frequent remarks about black people that Plaintiff considered racist.  ECF No. 72-2, Pl.'s Depo. at 44-50, 62-65.  According to Plaintiff, Witsch often recounted racist remarks that her father had made.  *Id.* at 44-47, 62-64.  In or around March of 2018, Plaintiff spoke to Wayne Sharrow regarding Witsch's comments and asked that he address it with Witsch.  *Id.* at 52-53, 55.  Plaintiff states that, although Sharrow indicated he would talk to Witsch, she was never informed whether that took place. Id. at 53. Plaintiff testified that she eventually changed her start time from 8:00 a.m. to 7:00 a.m. to limit her time in the office, but this did not fully remedy the situation because she still had to be in close quarters with Witsch during the lunch hour when the Prison would be on lockdown.  *Id.* at 68-71.  According to Plaintiff, Witsch's unwelcome remarks continued and Plaintiff eventually informed Witsch that her comments were making her uncomfortable and that she wanted to limit their interactions to strictly professional matters.  *Id.* at 53. 56-58.  Witsch allegedly responded, "I'm sorry you feel that way. My father is old fashioned. But I'm not racist. My daughter has

black friends." Id. at 58. Plaintiff admits that she did not make any formal complaints about Witsch's comments and never reported them to Stairways' human resources department, nor did she discuss the matter with any employees of the prison. *Id.* at 56, 66, 71. She states that she did share her complaints with Casey, who expressed sympathy. *Id.* at 59-61.

Ultimately, Plaintiff's tenure in the drug and alcohol program lasted from November 2017 until May 25, 2018 when she was barred from working at ECP. According to the Defendants, Plaintiff was removed from the Prison because of a series of dress code infractions. The parties largely dispute the nature and extent of these alleged infractions.

According to the Defendants, the first incident occurred in or around January of 2018 when Plaintiff was observed wearing a scarf inside of the Prison. This was reported to Seymour, who asked Petruso to speak with Plaintiff. ECF No. 79, ¶¶37-39; ECF No. 89, ¶¶37-39; *see also* ECF No. 74, ¶44; ECF No. 88, ¶44. Seymour later testified that he considered Plaintiff's scarf to be a significant safety concern because it could be "wrapped around her neck," allowing Plaintiff to be choked, "or it can be used as a weapon on any other person in the jail." ECF No. 79, ¶39; ECF No. 89, ¶39; *see* ECF No. 72-3, Seymour Depo. at 11, 32. Petruso recalled that she relayed Seymour's concern about Plaintiff's scarf to either Witsch or Casey. ECF No. 72-7, Petruso Depo. at 25-26; ECF No. 72-8, Petruso Depo. at 11-12. Witsch testified that the matter was brought to her attention and that she addressed it directly with Plaintiff. *See* ECF No. 72-10, Witsch Depo. at 11-12.

Plaintiff does not deny this particular incident: she admits to wearing a scarf in the inmate pod area on one occasion, but she maintains that the prohibition on scarves was never addressed during her training and further states that once the safety concern was raised with her, she never wore one again. *See* ECF No. 72-2, Pl.'s Depo at 80-82; ECF No. 92-1, Hrg. Tr. at 38.

Plaintiff also recalls that it was Casey, not Witsch, who brought the security risk to her attention. *See* ECF No. 72-2, Pl.'s Depo at 81, 92.

Defendants next claim that Plaintiff violated the Prison's dress code standards in or around April 2018, when she was seen wearing a graphic tee shirt in the prison pod area without her prison jacket. ECF No. 74, ¶45; ECF No. 79, ¶¶42- 43. Graphic tee shirts are prohibited attire in the Prison because the messages they carry can have different meanings to different inmates, can offend or arouse certain inmates, and may be subject to different interpretations and innuendos. ECF No. 74, ¶55; ECF No. 79, ¶44.[2] According to the Defendants, Seymour spoke to Petruso about this incident and Petruso then passed Seymour's concerns along to Casey, who addressed the matter with Plaintiff directly. ECF No. 74, ¶¶45-47; ECF No. 79, ¶45.

Plaintiff largely denies this incident. She admits that, on one occasion, she wore a tee shirt with the Aeropostale logo on it, which merely read "Aero." ECF No. 88, ¶45. She denies, however, that this was an inappropriate tee shirt, and also denies ever being confronted about an inappropriate tee shirt. *Id.* at ¶¶ 46-47. Plaintiff *does* acknowledge being informed by Casey that Petruso had complained about her (Plaintiff) not wearing her zip-up jacket during a trip to the restroom, an incident which Plaintiff states happened during her lunch break when she was not in the prison pods or within access of any inmate. ECF No. 88, ¶47. Plaintiff contends she was never instructed to wear her jacket other than when she was in the view of inmates. *Id.*

Defendants assert that Plaintiff's attire became an issue once again in May 2018 when Monica Carroll, an Inmate Services Coordinator for ECP, observed Plaintiff wearing a low-cut, tight-fitting graphic tee-shirt with the Dr. Seuss characters "Thing 1" and "Thing 2" across the

---

[2] Seymour also testified at the unemployment compensation hearing that uniforms "identify you as an employee of the jail" and "[Plaintiff] being relatively new . . . was not readily identifiable." ECF No. 92-1, Hrg. Tr. at 25-26.

chest and without her prison jacket on.  ECF No. 74, ¶¶50-51.  According to Carroll, this was the second time she had seen Plaintiff wearing that particular tee-shirt without her jacket while in an inmate pod.  *Id.* at ¶52.  Like graphic tee shirts, low-cut tops and form-fitting clothing are deemed a security risk and are therefore prohibited attire in ECP, because they can result in innuendo and inappropriate messages to the mostly male population.  *Id.* at ¶¶56-57.  Carroll testified that she explained to Plaintiff her shirt represented a violation of ECP's dress code because it was a graphic tee-shirt, was low cut, and was form fitting.  *Id.* at ¶53.  Carroll states she advised Plaintiff that, if this kind of shirt was going to be worn in the pod, Plaintiff should wear the uniform jacket over it, zipped up.  *Id.*  After speaking to Plaintiff, Carroll informed Sutter and Seymour about Plaintiff's inappropriate attire and the fact that she had discussed the matter with Plaintiff.  *Id.* at ¶58; *see also* ECF No. 72-5, Carroll Depo. at 18-21, 29-30; ECF No. 72-6, Carroll Depo. at 11-18; ECF No. 72-3, Seymour Depo. at 23-24, 44.

Plaintiff disputes Defendants' assertions as they relate to her own interaction with Carroll.  According to Plaintiff, Ms. Carroll -- who is also African American -- introduced herself to Plaintiff, then a newer employee, and remarked that it "was nice to see another African American woman in the prison."  ECF No. 72-2, Pl. Depo. at 87; *see id.* at 187.  Carroll then allegedly cautioned Plaintiff that she "needed to be careful" because "they watch us harder."  *Id.* at 87.  Although Carroll did not expound on what she meant by this remark, Plaintiff understood this to mean "[t]hat they watch the black employees more than they do the white ones."  *Id.* at 89, 187.  Plaintiff claims Carroll advised her that "a lot of things were going to be changing and they were going to have a couple meetings coming up and one of them was dress code" and "she hoped to see me there."  *Id.* at 88.  Plaintiff testified that this was her only interaction with Carroll and that their conversation had nothing to do with a dress code violation.  *Id.* at 186, 188.

She expressly denies ever wearing a tee shirt with images of the Dr. Seuss characters "Thing 1" and "Thing 2" on it. ECF No. 92-2, ¶2. She also denies ever wearing a tee shirt that was tight fitting or revealing. ECF No. 72-2, Pl. Depo. at 93. Finally, she denies having any conversation with Carroll about the uniform jacket or keeping it zipped up. *Id.* at 90, 113.[3]

The Defendants next allege that, on or about May 24, 2018, Sutter and Seymour observed Plaintiff attempting to enter the Prison while wearing yoga pants or leggings, a prohibited clothing item. ECF No. 74, ¶¶59-60. Carroll also claims to have witnessed Plaintiff entering the facility in purple "jeggings." ECF No. 72-5, Carroll Depo. at 23-24; ECF No. 72-6, Carroll Depo. at 16. Defendants maintain that, at Sutter's direction, a call was made to the lobby officer, who was advised that Plaintiff should not be permitted entry into the facility because of the way she was dressed. ECF No. 74, ¶61. That same day, Sutter had a telephone conversation with Mrenak concerning Plaintiff's alleged failures to follow the Prison dress code. *Id.* at ¶62. At that time, Sutter indicated that he was not sure if he would allow Plaintiff back into the Prison. *Id.*; *see also* ECF No. 79, ¶¶50-52.

Plaintiff disputes that she committed any dress code violation as described by Defendants. First, she expressly denies ever wearing yoga pants, tights, or similar clothing to or inside the Prison, including on May 24, 2018. ECF No. 92-2, ¶3. Second, she denies having been barred from ECP on May 24, 2018, claiming instead that she performed her regular duties as a drug and alcohol therapist that day and had no interaction with prison administrative staff. *Id.* at ¶1. Plaintiff flatly asserts that the alleged dress code violation on May 24, 2018 -- which

---

[3] This is in contradiction to Plaintiff's earlier testimony at the UEC hearing, where she recalled Carroll advising her and Witsch "how the prison was going to get more strict and that we all need to make sure that we have our jackets on at all times." ECF No. 92-1, Hrg. Tr. at 45. Plaintiff recalled having asked Carroll at that time whether the uniform jacket needed to be zipped up and Carroll responding, "[N]o, it just has to be on." *Id.* at 46. For present purposes, the discrepancy is immaterial.

was never raised during the ensuing unemployment compensation (UEC) proceedings -- is a post-hoc fabrication. ECF No. 92-2, ¶3; ECF No. 89, ¶50. She contends that the alleged infraction is belied by contemporaneous records as well as by Seymour's acknowledgment at the UEC hearing that employees are not required to be in uniform on their way into the Prison and are permitted to change once they arrive. ECF No. at 92-1, Hrg. Tr. at 29.

In any event, there is no dispute that the topic of Plaintiff's alleged dress code infractions came to a head on May 24, 2018. Contemporaneous emails suggest that Mrenak was somehow alerted to the issue that morning, prompting a discussion between Mrenak and Brenda Sandford, Stairways' Director of Human Resources. *See* ECF No. 92-5 (email chain between Mrenak and Sanford). At Sandford's direction, Mrenak contacted the director of the blended case manager program, Amy Brocious, to inquire whether there was an opening in that division into which Plaintiff could transfer. ECF No. 72-11, Mrenak Depo. at 8-10; *see* ECF No. 79, at ¶¶57-59. Mrenak then emailed Sanford at 11:56 a.m. with the message: "BCM has declined to have Nikkie transfer back to them. How would you recommend that we proceed from here?" ECF No. 92-5 at 2. Thereafter, Mrenak and Sutter spoke by telephone, which prompted Mrenak to send the following email to Sandford:

> So I just got a call from Deputy [sic] Warden Sutter at the Erie County Prison with a serious complaint about Nikkie. He indicated that we need to get her out of there. She had been talked to by the jail over a week ago regarding her attire and needing to follow the dress code. She is not following the dress code, and he indicated that she is flaunting the fact that she does not have to follow it. He has also gotten complaints from other prison staff regarding Nikkie. He indicates that we need to get her out of there, because one more issue and she will not be permitted to enter his jail. This could potentially affect our contract with [the] county and our relationship with the jail. If I can reach her, I am going to have her report to the clinic to meet with Wayne and I to address the issue. If not, I plan on having her start her day at the clinic to go over this. Is this grounds to move forward with a termination with her? . . .

ECF No. 92-5 at 1.

Meanwhile, Mrenak had emailed Casey that same day with the request that Casey produce a "timeline about the wardrobe issues with Nikkie[.]" ECF No. 92-3. Casey responded later that afternoon with an email providing the following summary:

> January (or one of the colder months) - was wearing a scarf in the pods. Deputy Warden Seymour asked Michelle to address with her and she was made to take it off
>
> April 2018 - Stacey was informed by Deputy Warden Seymour that he saw her coming in to work with a printed shirt and no uniform. Stacey asked me to say something. A conversation was had about the written ECP policy dress down days, as well as Uniform shirts must be worn at all times.
>
> Early May 2018 - Monica talked to her about the policy and reiterated to always have uniform shirt on and zipped up.
>
> Tuesday (5/22) - Deputy Warden Seymour asked Stacey to address uniform again. She had her uniform jacket on but did not have it zipped up in the pods/around the jail. Stacey asked me to tell her, so I let her know again that her printed shirts had been brought up. . . .

*Id.*

In light of these developments, Mrenak contacted Plaintiff on May 24, 2018 and directed her to report to Stairways' outside clinic the following day rather reporting to than ECP. *See* ECF No. 92-5 (May 25, 2018 email from Mrenak to Sandford); ECF No. 92-1, Hrg. Tr. at 48.

On the morning of May 25, 2018, Plaintiff sent an email to Mrenak in which she expounded on her understanding of the Prison's dress code and certain conversations she had had with staff members about her attire. In relevant part, Plaintiff wrote:

> I was instructed prior to working at ECP that the dress code is khaki pants/dress pants, a solid color shirt, and the ECP support jacket. I was also told that Friday's are dressed down day, so jeans were permitted with an appropriate shirt. In April one of my co-worker[s] told me that Stacey [Petruso] . . . called them and stated that the warden did not approve of my shirt. Once I received that information I stopped wearing that shirt. Then two weeks ago the prison had a meeting addressing dress code in the prison, which I was not invited too [sic]. After the meeting the inmate coordinator Monica [Carroll] came to the D&A office and told me that on Friday's I also need to wear my jacket inside of the pods even though it [sic] dress down. She stated when I'm outside the pods I can have it off. I asked Monica if I had to zip my jacket up and she responded "NO". Ever since my conversation with Monica I have made sure to have my ECP support jacket on every Friday. All I can

> say is that I apologize to the War[d]en if he thought I was being disrespectful in anyway because I was not doing anything with malice.  I thought once I corrected the two dress code violations that were brought to my attention, that the problems were solved. . . .

ECF No. 78-5.

After Plaintiff reported to work at Stairways' clinic, Mrenak met with her to discuss the concerns raised by Sutter.  ECF No. 79, ¶62.  According to Plaintiff's testimony at the UEC hearing,

> [Mrenak] she said that she had got a call from the Warden and he was screaming at her upset stating that since I didn't follow dress code protocol, he didn't want me on the premises. She said she couldn't get any answers cause he was yelling and that she wasn't going to continue the conversation with him yelling at her so she got off the phone. She said until this situation gets straightened out and I can see if I can get you back on the premises, I would like you to work at the clinic today. And then you know we'll work, I'll give you an answer of what we are going to do after that at the end of the day. . . .

ECF No. 92-1 at 48.  Plaintiff acknowledges that she spoke to Mrenak about the alleged dress code violations, including the May 22 incident to which Casey referred in her summary. Plaintiff recounted that discussion at the UEC hearing:

> I said what do you mean about violation of dress code. I said you seen me every Tuesday when I come up to meeting, I have on the same thing. [Mrenak] was like yeah but they said you didn't zip up your jacket. And I started to laugh, I was like what? I was never told to zip up my jacket. . . . She said yeah, your pants are fine, the jacket is fine, they said you didn't zip it up. I said no one ever told me to zip it up and that's what I told her. And . . . then she started laughing, she said its [sic] ridiculous. She said but we can't argue with the prison because . . .  we're contracted to them so what they say, goes.

ECF No. 92-1 at 48-49.

Both sides agree that, on or around May 25, 2018, Mrenak had a second telephone conversation with Sutter in which a decision was made that Plaintiff would not be returning to the prison.  There is some ambiguity in the record as to how this decision was reached.  Mrenak testified that it was Sutter who indicated that Plaintiff was not welcome back to the Prison.  ECF No. 72-11, Mrenak Depo. at 13-15.  Sutter admits to revoking Plaintiff's security clearance but also testified that Mrenak informed him Plaintiff would not be returning to ECP.  ECF No. 72-4,

Sutter Depo. at 15-17.  In either case, there is no dispute that Plaintiff was unable to perform her duties as a drug and alcohol therapist at ECP once she was precluded from returning to the Prison.  ECF No. 79, ¶54.

It is also undisputed that Stairways terminated Plaintiff's employment on May 30, 2018. The letter of termination, written by Sanford, stated the following:

> Recently, you have received notification from Erie County Prison personnel regarding your work attire not meeting their dress code requirements. We have been notified that you have been spoken to about your failure to follow dress code requirements several times prior to this as well. Since this last time, Erie County Prison has reached out to Stairways Administration and notified us that you are no longer permitted on their premises. Since we cannot control access to the Prison, we must abide by their request to remove you from that location. Unfortunately, stairways currently has no other positions available for you and we are therefore terminating your employment effective today . . .

ECF No. 78-7. Stairways maintains that it initially considered whether it could transfer Plaintiff to a different position within the organization.  To that end, Mrenak made inquiries with the BCM program where Plaintiff had previously worked, because there were no other openings at the time in the Drug and Alcohol program.  ECF No. 72-11, Mrenak Depo. at 8-10.  Both Mrenak and Sanford testified that the BCM program was already in the process of hiring candidates for their only open positions.  *See* ECF No. 72-11, Mrenak Depo., at 8-10; ECF No. 72-12, Sanford Depo. at 50-51.  As a result, Stairways maintains that no other openings existed to which Plaintiff could be transferred.  ECF No. 79, ¶¶60, 64, 67.

## II.    PROCEDURAL BACKGROUND

In July 2019, Plaintiff commenced litigation in Pennsylvania state court with the filing of a complaint against Erie County, ECP, and Stairways.  ECF No. 1-1 at 1.  The matter was subsequently removed to this Court, as Plaintiffs' claims were partly predicated on federal law. *See* ECF No. 1 and ECF No. 1-2.  Following removal, Plaintiff amended her complaint, terminating ECP as a Defendant and adding Seymour.  ECF No.

Plaintiff's operative pleading at this point is her Second Amended Complaint ("SAC"), which asserts three causes of action. ECF No. 17. In Count I of the SAC, Plaintiff has sued Seymour under 42 U.S.C.§1983[4] based on his alleged violation of her statutory right to make and enforce an employment contract with Stairways, which Plaintiff claims denied her the rights enjoyed by white citizens in violation of 42 U.S.C. §1981.[5] ECF No. 17, ¶¶27-31. In Count II of the SAC, Plaintiff asserts a Title VII claim against Stairways and Erie County for alleged racial discrimination in her employment. *Id.* at ¶¶32-33. In Count III, Plaintiff asserts a corresponding claim of race-based employment discrimination against Stairways and Erie County under the PHRA.

The County and Seymour (collectively, the "County Defendants") filed a motion for summary judgment on all claims against them, ECF No. [72], as did Stairways, ECF No. [76]. These motions have been fully briefed and the issues are now sufficiently joined for adjudication.

## III.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

---

[4] "Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States." *Shuman v. Penn Manor School Dist.*, 422 F.3d 141, 146 (3d Cir. 2005) (citation omitted). This statute "does not create any new substantive rights but instead provides a remedy for the violation of a federal constitutional or statutory right." *Id.* (citation omitted).

[5] *See McGovern v. City of Phila.*, 554 F.3d. 114 (3d Cir. 2009) (holding that an action under 42 U.SC. 1983 is the exclusive remedy for a violation of 42 U.S.C. § 1981 by a state actor).

together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If the moving party satisfies this burden, the nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks and citation omitted). In conducting its analysis, the court must construe the record and any reasonable inferences in the light most favorable to the party opposing summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Id.*

## IV.    DISCUSSION

As noted, the operative pleading in this case sets forth claims of race discrimination under 42 U.S.C. §1981 and §1983, Title VII, and the PHRA. Each of these claims is governed by the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which is utilized in the absence of direct evidence of discrimination. *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999) (analyzing disparate treatment race discrimination claims under Title VII, Section 1981, and the PHRA pursuant to the *McDonnell Douglas* framework); *see also Warfield v. SEPTA*, 460 F. App'x 127, 129 n.2 (3d Cir. 2012) (noting that "Pennsylvania courts have interpreted the PHRA interchangeably with Title VII" and "[t]he same analysis also is used in § 1981 and § 1983 cases.") (citing authority).

Under this well-established paradigm, courts employ a three-step analysis. The plaintiff has the initial burden to establish a *prima facie* case of discrimination, by satisfying all the elements set forth in *McDonnell Douglas*. *Id.* at 802. After the plaintiff establishes a *prima facie*

case for discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* For the defendant to carry this burden, the defendant must "clearly set forth" a nondiscriminatory reason. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981). If the defendant meets this burden, the burden shifts to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons" and were instead "a pretext of discrimination." *Id.* at 253 (citing *McDonnell Douglas*, 411 U.S. at 804).

To establish a *prima facie* case, Plaintiff must present evidence sufficient to show that (1) she belongs to a protected class, (2) she was qualified for the position in question, (3) she was subjected to an adverse employment action, such as termination, and (4) the circumstances of the adverse action "give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253. In this case, the parties do not dispute that Plaintiff belongs to a protected class, was qualified to perform her job, and suffered an adverse consequence. Likewise, there is no dispute that both the County and Stairways articulated non-discriminatory reasons for their challenged actions. The key disputes therefore concern whether Plaintiff presented evidence to satisfy the fourth prong of her *prima facie* case and/or whether she presented evidence sufficient to establish pretext.

For the reasons below, the Court concludes that Plaintiff has failed to raise a genuine issue of fact relative to the fourth prong of her *prima facie* case. As a result, her claims against the Defendants cannot proceed.

### A. Plaintiff's Claim Against Seymour under 42 U.S.C. §§1983 and 1981

Count I of the SAC sets forth a claim under 42 U.S.C. §1983 against Defendant Seymour based on his alleged violation of 42 U.S.C. §1981. The latter statute provides, in pertinent part,

that "[a]ll persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens ...." 42 U.S.C. § 1981(a). For purposes of Section 1981, the "making" and "enforcement" of contracts includes (among other things) the "performance" of a contract as well as "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

"Liability under § 1981 is personal in nature, much like that under § 1983, and cannot be imposed vicariously." *Boykin v. Bloomsburg University of Pennsylvania*, 893 F. Supp. 378, 394 (M.D. Pa. 1995). And to be actionable, an alleged violation of §1981 must involve purposeful race-based discrimination. *See General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982) (concluding that Section 1981 "can be violated only by purposeful discrimination"); *see also O'Haro v. Harrisburg Area Cmty. Coll.*, No. 1:18-cv-02073, 2020 WL 5819768, at *14 (M.D. Pa. Sept. 30, 2020) ("Under the statute, a plaintiff who belongs to a racial minority may bring a claim for purposeful race-based discrimination" relating to an activity identified in Section 1981(a)) (citing *Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001)).

Here, Plaintiff asserts that Seymour violated Section 1981 when he impaired her right to make and enforce her contract of employment with Stairways for reasons motivated by Plaintiff's race. The County Defendants initially argue that Seymour cannot be liable under Section 1981 because he was not responsible for the decision to revoke Plaintiff's security clearance at ECP.

This argument is not well-taken. To be sure, there is some ambiguity in the record as to whether Sutter or Mrenak determined that Plaintiff would not be returning to ECP after May 25,

2018, and under either scenario, Seymour was not the individual who made the final decision.
Yet this fact is not necessarily dispositive because the evidence also suggests that Seymour had input into the decision-making process that resulted in Plaintiff's removal from ECP. "Individuals can face personal liability under Section 1981 if they cause an intentional infringement of an individual's Section 1981 rights or 'if they authorized, directed, or participated in the alleged discriminatory conduct.'" *Randolph v. Allied Crawford Steel, Inc.*, Civil No. 1:20-CV-017352021 WL 1666980 at *3 (M.D. Pa. Apr. 28, 2021) (quoting *Al-Khazraji v. Saint Francis Coll.*, 784 F.2d 505, 518 (3d Cir. 1986), *aff'd*, 481 U.S. 604 (1987)). Construing the evidence most favorably to Plaintiff, a jury could infer that Seymour played a role in advising Sutter of some of Plaintiff's alleged dress code violations and also participated in discussions concerning her removal. ECF No. 72-3, Seymour Depo. at 22; ECF No. 72-4, Sutter Depo. at 12-13, 18, 19. This is sufficient to establish Seymour's personal involvement in the decision to remove Plaintiff from ECP.

Defendants also argue, however, that there is no evidence to show that Seymour intentionally discriminated against Plaintiff on the basis of race. The Court agrees that, to the extent Seymour had input into the decision to remove Plaintiff from ECP, the evidence as to unlawful discrimination is insufficient. Here, the parties agree that Seymour had no direct interaction with Plaintiff during her time at ECP, and no derogatory or racist remarks are attributed to him. Plaintiff points to other evidence, however, which she believes establishes the necessary inference of racial animus. In this Court's view, Plaintiff's proffer falls short of establishing a genuine issue for trial.

Primarily, Plaintiff contends that Casey, Witsch, and Petruso -- all of whom are white -- violated dress code standards at ECP without any consequence. She claims that both Casey and

Witsch wore their jackets unzipped and took their uniform jackets off when on break in their office. ECF No. 72-2, Pl.'s Depo. at 84, 93-94, 95-96. She recalled a particular instance when Witsch wore a pink hoodie with a logo, without her uniform jacket, while on her way to the restroom. *Id.* at 85, 96. Plaintiff also cited an instance of Casey wearing an inappropriate dress top and black stretch pants with flowers for an unspecified lunchtime meeting. ECF No. ECF No. 72-2, Pl.'s Depo. at 94-95. She states that she observed Petruso walking past her office on one occasion in a short skirt with a slit up the back. ECF No. 72-2, Pl.'s Depo. at 99-101.

A *prima facie* inference of unlawful discrimination may be drawn from evidence that similarly situated individuals who were not members of the protected class were treated more favorably than the plaintiff. *Moye v. Verland Found.,* No. 2:21-CV-646, 2022 WL 3700665, at *4 (W.D. Pa. July 26, 2022) (citing *Jones v. Sch. Dist. of Phila.,* 198 F.3d 403, 410–11 (3d Cir. 1999)). To be valid comparators, employees need not be "identically situated," but they must be similar in "all relevant respects." *Opsatnik v. Norfolk S. Corp.,* 335 F. App'x 220, 223 (3d Cir. 2009). This necessarily includes a showing that the relevant decisionmaker was *aware* of the comparators' misconduct. *See, e.g., Koslosky v. Am. Airlines, Inc.,* No. 20-2081, 2022 WL 4481537, at *3 (3d Cir. Sept. 27, 2022) (affirming grant of summary judgment in favor of employer in gender discrimination case where plaintiff presented evidence of a co-worker's inflammatory social media posts but did not argue that the employer knew about the posts); *Andrews v. PNC Nat'l Bank, N.A.,* No. 2:19-CV-1631-RJC, 2022 WL 5246227, at *7 (W.D. Pa. Oct. 6, 2022) (noting that, "a factfinder could not draw an inference that [the employer] treated [plaintiff's comparator] more favorably than [the plaintiff] without evidence that any decisionmaker . . . knew about [the comparator's] misconduct"); *McWilliams v. Cmty. Educ. Centers,* No. CV 14-4783, 2015 WL 12843826, at *4 (E.D. Pa. Nov. 13, 2015) ("Where an

employer does not know of an alleged comparator's action, the employer cannot have taken disciplinary action and the comparators 'cannot be described as similarly situated to plaintiff.'") (quoting *Ade v. KidsPeace Corp.*, 698 F. Supp. 2d 501, 515 (E.D. Pa. 2010)); *Glass v. Armstrong Utilities*, No. 13-1173, 2014 WL 7015966, *7 (W.D. Pa. Dec. 10, 2014) ("It is well-established that an individual cannot serve as a disciplinary comparator based on conduct that was unknown to management."); *Oliver v. Clinical Pracs. of Univ. of Pa.*, 921 F. Supp. 2d 434, 448 (E.D. Pa. 2013) (coworker was not relevant comparator absent evidence that decisionmaker had awareness of coworker's alleged conduct).

Here, Plaintiff has failed to adduce evidence sufficient to show that Seymour -- or any other prison administrator, for that matter -- was actually aware of her coworkers' alleged dress code violations. At her deposition, Plaintiff could not say whether Witsch wore her hoodie in the inmate pod area or anywhere other than to use the bathroom, nor did she know whether the hoodie was visible underneath her prison jacket at any point that day. ECF No. 72-2, Pl.'s Depo. at 85-86. Plaintiff could not recall exactly when Casey wore the black stretch pants outfit and did not know whether anyone at the Prison had spoken to Casey that day about her attire. *Id.* at 94-95. Indeed, Plaintiff admits that she never reported her co-workers' alleged infractions to anyone, *id.* at 94, 96, 98, 99, 101, nor did she have any conversations with anyone at the prison that led her to believe others were aware of them. *Id.* at 98, 99, 101-102. And when questioned about the matter, Seymour flatly denied any awareness of dress code violations by the other Stairways staff members. *See* ECF No. 92-1, Hrg. Tr. at 27; ECF No. 72-3, Seymour Depo. at 28, 34-35.

Plaintiff attempts to circumvent this problem by suggesting that prison administrators must have known of her coworkers' alleged dress code violations because of the presence of

20

security camera in the jail. *See* ECF No. 72-2, Pl.'s Depo. at 97-98. But this reasoning rests solely on conclusory assumptions about what unspecified prison officials must have seen. It is entirely non-probative as to whether, when, and how Seymour would have personally learned of any particular infraction. Indeed, because Plaintiff's removal from ECP occurred only after several alleged violations were made known to Seymour,[6] Plaintiff must establish that Seymour was aware of multiple infractions by at least one white comparator who was treated more favorably. *See, e.g., Glass v. Armstrong Utilities*, No. CIV.A. 13-1173, 2014 WL 7015966, at *7 (W.D. Pa. Dec. 11, 2014) ("Courts have repeatedly held that co-workers who have markedly disparate disciplinary records are not 'similarly situated.'") (citing authority). Simply stated, Plaintiff's "comparator evidence" fails to establish a genuine issue of fact about Seymour's awareness of similar dress code violations by white employees. Consequently, this evidence cannot support a reasonable inference that Seymour engaged in purposeful race-based discrimination relative to Plaintiff's removal from ECP.

Plaintiff's other evidentiary proffers are similarly insufficient. For example, Plaintiff points to the fact that Seymour addressed her alleged dress code infractions with her white coworkers rather than with her personally. Here, the record shows that Seymour approached both Petruso and Witsch concerning the perceived dress code issues. Petruso was Stairways' only supervisory employee at ECP and had worked within the prison since 2011. ECF No. 72-7,

---

[6] Plaintiff acknowledges that she was instructed to remove her scarf on one occasion and was spoken to on another occasion about taking her jacket off during a trip to the bathroom. The record shows that Seymour was informed of the first incident and that he claimed to have personally witnessed an incident where Plaintiff was not properly wearing her prison jacket, which resulted in Casey addressing the matter with Plaintiff. It is also undisputed that Carroll informed Seymour that she had observed Plaintiff wearing an inappropriate graphic tee shirt while in the prison pod area. Although Plaintiff disputes this latter infraction and the nature of her conversation with Carroll, she offers no evidence to contradict the fact that Carroll reported the dress code violation to Seymour.

Petruso Depo. at 13, 24; ECF No. 72-8, Petruso Depo. at 10.  Several witnesses offered

uncontradicted evidence that Petruso was used as a point of contact between prison officials and

Stairways employees.  *See* ECF No. 72-5, Carroll Depo. at 37; ECF No. 72-7, Petruso Depo. at

24, 50-51; ECF No. 72-8, Petruso Depo. at 10; ECF No. 72-10, Witsch Depo. at 46.  Sutter and

Seymour similarly testified that they would generally rely on Stairways or other contract

employees to "police their own people" and "correct the behavior before we have to take action."

ECF No. 72-3, Seymour Depo. at 10; *see* ECF No. 72-4, Sutter Depo. at 20 ("We would ask one

of the Stairways people and/or one of our people that would be their peer to speak to them about

a violation depending on what had occurred and the severity of the violation.").  The fact that

Seymour asked Petruso to address Plaintiff's work attire issues on his behalf is not probative of

racial animus.

     As for Witsch, the evidence suggests that Seymour spoke with her on two occasions

concerning Plaintiff's work attire.  According to Witsch, the initial contact happened when

Seymour called the drug and alcohol office to address the security concerns related to Plaintiff's

scarf.  ECF No. 72-10, Witsch Depo. at 11, 46-47.  Witsch testified that Seymour "just called the

office phone, so if [Plaintiff] would have answered, he would have told her directly, but I was the

one that answered, and she was not in the office at that time or he would have told her directly. . .

." *Id.* at 46-47.  Witsch conversed with Seymour again on May 24, 2018, when she happened to

be in the prison administrative office talking to someone else.  ECF No. 72-10, Witsch Depo. at

17, 19.  According to Witsch, Seymour asked her "why [Plaintiff] can't listen about the dress

code." *Id.* at 26.  Witsch confirmed that Plaintiff had been spoken to several times about her

attire but declined to comment further, citing "personnel issues that Stairways is addressing." *Id.*

Although Plaintiff has accused Witsch of making racists comments on a regular basis, there is no

evidence in the record to suggest that Seymour was aware of, or endorsed, Witsch's alleged racial bias, and nothing in Seymour's interaction with Witsch suggests purposeful discrimination.

Plaintiff has also cited her belief that Seymour excluded her from weekly meetings between command staff and treatment teams, which her white coworkers attended. But the evidence shows that Seymour had no part in determining who attends these meetings, and Sharrow testified that they were generally attended by senior therapists. *See* ECF No. 72-3, Seymour Depo. at 36; ECF No. 72-13, Sharrow Depo. at 21-22. Petruso testified that one of Stairways' mental health counselors who is African American regularly attended the weekly meetings. *See* ECF No. 72-8, Petruso Depo. at 8, 23. Nothing about these circumstances suggests that Seymour was treating Plaintiff differently than others because of her race.

Plaintiff also alludes in her brief to Carroll's alleged comment that "they watch us harder," which Plaintiff understood it to mean that black employees were subjected to greater scrutiny and held to a different standard. No further elaboration has been provided to establish that Carroll's alleged statement was a reference to Seymour in particular, as opposed to any of the other corrections officials or personnel with whom Plaintiff might regularly come into contact. Therefore, the Court views this alleged comment as, at most, a stray remark with limited probative value. And to the extent Plaintiff infers from Carroll's statement that Seymour used bogus dress code violations as an excuse to engineer Plaintiff's removal from ECP because of her race, such an inference is belied by the undisputed fact that Carroll herself, an African American employee of the County, informed Seymour that she had personally witnessed Plaintiff violating the dress code by wearing a low-cut graphic tee shirt without the required jacket.

Plaintiff posits that "disparate treatment was evidenced" when an unknown Corrections Officer on two occasions refused to touch a list of clients that Plaintiff was attempting to hand him. ECF No. 91 at 3; ECF No. 72-2, Pl.'s Depo. at 108-111. Again, however, there is nothing in the record to suggests that Seymour himself knew of this conduct, endorsed it, or personally held racially biased views. In fact, Plaintiff admitted that she did not report the incident and that no other Stairways employees witnessed it. *Id.* at 111. She has no knowledge whether the conduct was brought to the attention of the warden or deputy wardens. *Id.*

In sum, having thoroughly reviewed the summary judgment record, the Court finds insufficient evidence that Seymour engaged in purposeful, race-based discrimination against Plaintiff relative to her removal from ECP. Accordingly, the County Defendants' motion for summary judgment will be granted relative the claim against Seymour.

### B. Plaintiff's Title VII and PHRA Claims Against the County of Erie

Counts II and III of the SAC set forth claims against the County under Title VII and the PHRA for race-based employment discrimination. Here, Plaintiff is attempting to hold the County liable for employment discrimination under the theory that the County and Stairways acted as her "joint employers." *See City of L.A. v. Manhart*, 435 U.S. 702, 718 n.33 (1978) (noting that Title VII "primarily govern[s] relations between employees and their employer, not between employees and third parties"). The County disputes that it was a "joint employer" and denies that it engaged in racial discrimination. Because the latter issue is dispositive, the Court need not reach the "joint employer" issue.

As noted, Plaintiff's claims under Counts II and III are governed by the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green, supra*. Based largely on the foregoing analysis, the Court concludes that Plaintiff's Title VII and PHRA claims against the

County are legally untenable because Plaintiff has failed to adduce evidence that would support a *prima facie* case of unlawful discrimination.

As previously explained, Plaintiff's comparator evidence fails to support a reasonable inference of discriminatory animus on the part of Seymour. To the extent such evidence relates to Sutter, any inference of unlawful discrimination is equally attenuated. No probative evidence has been produced to demonstrate that Sutter was personally made aware of dress code violations by Plaintiff's white comparators. Accordingly, no reasonable inference can be drawn that Sutter intentionally treated those comparators more favorably, or that he was motivated by issues of race.

As noted, Plaintiff has alleged that Witsch made racist comments, and the record reflects that Sutter had conversations with Witsch on a number of occasions. ECF No. 72-4, Sutter Depo. at 24, 29-30, 42-43. Significantly, though, no evidence has been presented to show that Sutter was aware of Witsch's alleged comments, much less that he endorsed them or that his decision to bar Plaintiff from ECP was motivated by similar animus. And notably, the incidents that the County Defendants have cited as dress code violations did not originate from reports made by Witsch; rather, they involved incidents that Seymour and Sutter claimed to have personally observed and/or learned about from other third parties. Thus, Sutter's conversations with Witsch do not give rise to a permissible inference that Sutter barred Plaintiff from ECP on the basis of her race.

### C. *Plaintiff's Title VII and PHRA Claims Against Stairways*

Plaintiff's Title VII claims against Stairways fairs no better, as the evidence does not support a reasonable inference that Stairways took any adverse action against Plaintiff on the basis of her race. For purposes of evaluating Plaintiff's prima facie case, there are two potential

adverse actions that need to be considered: (1) Stairways' possible role in removing Plaintiff from the prison, and (2) Stairways' decision to terminate Plaintiff's employment, effective May 30, 2018. Based on the record in this case no reasonable jury could conclude that either action was motivated by racial animus.

Here, the evidence shows that Mrenak and Sanford had discussions regarding Plaintiff's status at the prison and were also the decisionmakers with respect to her termination. Sanford testified that Stairways' executive director also participated in the discussion to discharge Plaintiff. ECF No. 72-12, Sanford Depo. at 69-70. No evidence has been presented to suggest that any of these decisionmakers held or expressed racially biased views, either generally or concerning Plaintiff specifically. Although Plaintiff has alleged that prison officials were racially biased in removing her from the facility, Plaintiff has offered no competent proof of that allegation and, moreover, she has adduced no evidence to suggest that Stairways' decisionmakers were aware of the alleged racial bias. In addition, Plaintiff has not argued that Mrenak or Sanford treated similarly situated white employees more favorably. In fact, Plaintiff does not allege that any employee of Stairways, other than Witsch, expressed racist views. ECF No. 72-2, Pl.'s Depo. at 67-68.

Concerning Witsch's alleged remarks, Plaintiff admits that she never made Stairways' human resources department aware of her complaints. ECF No. 72-2, Pl.'s Depo. at 66. Plaintiff also admits that she did not discuss this matter with Mrenak until she was called into the Stairways clinic on May 25, 2018 to discuss Warden Sutter's concerns about her attire. As explained by Plaintiff:

> When I met [Erin] on the 25th, I started the conversation about Michelle and then, she said this had nothing to do with Michelle." . . . The conversation on the 25th was that the warden had called her and said that I was not zipping up my jacket and so he didn't want me to come back to the prison. And then, she said that her and

Brenda would try to get a hold of the warden and see if they can straighten things out.

ECF No. 72-2, Pl.'s Depo. at 54-55.  Plaintiff claims she made it known to Mrenak that she had reported Witsch's conduct to Sharrow in March.  *Id.* at 55.  She maintains that Mrenak "dismissed" the matter and "continued to talk about what the warden had said to her over the phone." *Id.*  Given the unfolding circumstances on May 25, 2018 and the then-developing possibility that Plaintiff might be barred from the ECP, no reasonable jury could interpret Mrenak's response as evidence of unlawful discriminatory animus.

In her brief, Plaintiff cites Stairways' actions in connection with her termination as evidence of discrimination.  On this record, there is no dispute that Mrenak consulted the director of the blended case management program to inquire whether there were open positions to which Plaintiff might be transferred, because there were no other openings for Plaintiff within the drug and alcohol division.  ECF No. 72-11, Mrenak Depo. at 8-10.  According to Mrenak, she was advised that blended case management was already in the process of hiring individuals for two open positions and were essentially just waiting on clearances with the understanding that the new candidates would be brought on board and given a start date once the clearances came in. *Id.*  Plaintiff maintains that this "raises an inference of disparate treatment because there were positions in process and no excuse why the process could not have been interrupted to place Plaintiff in one of the then open positions." ECF No. 91 at 11.  She posits that any disruption that this would have caused to the other candidates "pales in comparison to the disruption unnecessarily visited on the relationship between Plaintiff and Stairways." *Id.*

This argument is wholly unpersuasive.  Here, the record shows that the decision not to transfer Plaintiff into the blended case management program was made in deference to the director of a separate division within Stairways, who would have typically had the final say on

27

hiring candidates. *See* ECF No. 72-11, Mrenak Depo. at 8-10; ECF No. 72-12, Sanford Depo. at 20-21. Plaintiff has presented no evidence to suggest that white employees within Stairways were treated more favorably under similar circumstances. Nor has she adduced any other evidence that could support an inference of unlawful discrimination on the part of Mrenak, Sanford, or other administrators.

Finally, Plaintiff posits that Stairways offered inconsistent explanations for her termination. She notes that, while her termination letter referenced the lack of open positions, Stairways later took the position in UEC proceedings that she had been terminated for willful misconduct. ECF No. 91 at 11. But while this might constitute evidence of "pretext," it does nothing to advance her *prima facie* case. Absent from this record is any evidence that Stairways perpetrated an adverse employment action under circumstances that permit an inference of racial discrimination. Accordingly, Plaintiffs' claims against Stairways cannot proceed.

## V.     CONCLUSION

Based on the foregoing reasons, the record taken as a whole could not lead a rational trier of fact to find for Plaintiff on any of her claims in the Second Amended Complaint. Accordingly, there is no "'genuine issue for trial," *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587, and the Defendants are entitled to summary judgment.[7]

An appropriate order follows.

SUSAN PARADISE BAXTER
United States District Judge

---

[7] The Court notes that the County Defendants have asserted crossclaims for indemnity against Stairways ECF No. 35 at 10-11, which, in light of this Memorandum Opinion and accompanying Order, are now moot. Accordingly, the County Defendants' crossclaims against Stairways will be dismissed.